**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**KARMEN ROLLER,**

        **Plaintiff,**

    **v.**                                  **5:12-cv-01680**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

        **Defendant.**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**THOMAS J. McAVOY**
**Senior United States District Judge**


## DECISION and ORDER

Plaintiff Karmen Roller, representing herself *pro se*, brought this suit under § 205(g) of the Social Security Act ("Act"), as amended, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for a period of disability insurance benefits. Plaintiff alleges that the decision of the Administrative Law Judge ("ALJ") denying the application for benefits is not supported by substantial evidence and contrary to the applicable legal standards. The Commissioner argues that the decision is supported by substantial evidence and made in accordance with the correct legal standards. Pursuant to Northern District of New York General Order No. 8, the Court proceeds as if both parties had accompanied their briefs with a motion for judgment on the pleadings.

## I.    PROCEDURAL HISTORY

On January 20, 2009, Karmen Roller ("Plaintiff") filed an application for a period of disability insurance benefits through March 31, 2005.  Administrative Transcript ("T") at 178-181. Plaintiff alleged that she was disabled by a neck/spinal injury, COPD and gerd.  Id. at 200.  Plaintiff indicated that her disability began on December 24, 1999 and continued to the present day.  Id. at 178.  The claim was initially denied on November 4, 2009.  Id. at 84.  After a hearing, (Id. at 27-83), Administrative Law Judge ("ALJ") Barry Peffley denied the application.  Id. at 14-22.

In his decision, the ALJ followed the five-step sequential evaluation process for determining whether a claimant is disabled pursuant to 20 C.F.R. § 404.1520(a).  Id. at 14-16.  First, the ALJ found that Plaintiff's earnings record demonstrated that she had acquired sufficient quarters of coverage to maintain insurance only through March 31, 2005, and that Plaintiff needed to establish a disability on or before that date in order to qualify for disability benefits.  Id. at 14, 16.  At step two, the ALJ found that Plaintiff had not engaged in substantial gainful activity between the alleged onset date of December 24, 1999 through her last insured date of March 31, 2005.  Id.  at 16.  Third, the ALJ assessed the claimant's impairments or combination of impairments, finding, that Plaintiff suffered from the severe impairments of cervical herniated nucleus puposus, mild carpal tunnel syndrome, chronic low back pain, headaches and gastroesophageal reflux disease.  Id. at 16.  He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.  Id. at 16.

Before moving on to the fourth step, the ALJ addressed Plaintiff's residual functional capacity ("RFC").   The ALJ concluded that Plaintiff could:

perform light work as defined in 20 CFR 404.1567(b) except the claimant is limited to work

2

that permits the claimant to sit or stand alternatively, but would not have to leave the workstation.  The claimant can only frequently push or pull with her right upper extremity; frequently operate foot control with her right lower extremity; frequently rotate, flex or extend her neck; occasionally climb ramps or stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch, bend, and crawl; frequently reach with her right upper extremity; occasionally reach overhead with her bilateral upper extremities; and frequently handle with her right upper extremity.  The claimant should avoid concentrated exposure to moving machinery and unprotected heights and irritants such as fumes, odors, dusts, gases, poorly ventilated areas, etc.  Further, work is also limited to simple, routine, repetitive tasks in a work environment free of fast paced production requirements; involving only simple work related to decisions with few, if any, workplace changes.

Id. at 17.

The ALJ then moved to step four and found Plaintiff could not perform any past relevant work.  Id. at 20.  Finally, at step five, the ALJ determined that there are "jobs that exist in significant numbers in the national economy that [Plaintiff] can perform."  Id. at 21.  This finding led the ALJ to conclude that Plaintiff is not disabled within the meaning of the Social Security Act.  Id. at 22.

On February 2, 2011, Plaintiff filed a Request for Review of Hearing Decision/Order. Id. at 9-10.  On August 24, 2011, the Appeals Council granted the request for review, which noted that Plaintiff could ask for an appearance and send more information within 30 days.  Id. at 6-8.  On March 7, 2012, Plaintiff's representative submitted a  brief.  Id. at 268-270.

On September 11, 2012, the Appeals Council issued an unfavorable decision.  Id. at 1-5. The Appeals Council stated that it "found no reason under our rules to review the Administrative Law Judge's decision."  Id. at 1.  The Appeals Council found that "the Administrative Law Judge's decision is the final decision of the Commissioner of Social Security in your case."  Id. at 1.  This action followed, with Plaintiff proceeding *pro se*.

## II.  FACTS

On the alleged onset date of December 24, 1999, Plaintiff was 37 years old.  Id. at 253.

Plaintiff does not dispute that her last date of coverage was March 31, 2005.[1] Plaintiff was born

April 9, 1962, and was 46 years old at the date of her initial filing.  Id. at 35.  She had a high school

education, as well as a number of years of college attendance.  Id. at 36.  Her reported past work

includes pre-loading for a package delivery service and home health care aide.  Id. at 36-38.

### a. Medical Records[2]

Plaintiff injured herself at work on December 24, 1999.  Id. at 296.  Dr. Ivan L. Wolf

performed an independent medical evaluation of Plaintiff on December 27, 1999.  Id.  Dr. Wolf

reported that Plaintiff had injured herself while repetitively lifting parcels which were jammed in a

cage.  Id.  While Plaintiff did not experience an accident or direct trauma, this motion caused

Plaintiff to develop pain in her upper back and lower neck.  Id.  Plaintiff complained of pain and

soreness that was only slightly relieved with Tylenol.  Id.  Examination revealed no tenderness on

the spine or paraspinal muscles in the thoracic or cervical region, and normal cervical spine motion

and strength.  Upper extremity motion, strength, reflexes and sensation were normal, as was flexion

of the lumbosacral spine and twisting of the torso.  Id.  Dr. Wolf diagnosed a cervical and thoracic

strain.  Id.  Dr. Wolf prescribed aetaminophen for Plaintiff, who was nursing a child.  Id.  He also

directed Plaintiff to use ice or heat for relief as needed.  Id.  Dr. Wolf also found that Plaintiff could

perform light duty with lifting, pushing, and pulling of no more than 10 pounds.  Id.  She was to

avoid overhead work with her arms.  Id.

Plaintiff began treating with Stephen C. Robinson, MD, for her various injuries in March

---

[1]Since the parties agree that the relevant period of insurance coverage ended on March 31, 2005, the Court will consider only the medical evidence from that period.

[2]Because the parties agree that the only relevant period is the period from December 24, 1999 to March 31, 2005, the Court will summarize the medical evidence only from that period.

2000.  On March 14, 2000, Dr. Robinson reported that Plaintiff had complained of thoracic spine pain since her workplace injury of December 24, 1999.  Id. at 482.  Her pain was localized to the mid thigh and upper thoracic spine, and she had some difficulty sleeping when turning over.  Id.  Additionally, Plaintiff had begun to suffer pain down her right arm.  Id.  Dr. Robinson's examination revealed some tenderness and pain in the thoracic area.  Id.  He diagnosed Plaintiff with a chronic upper thoracic strain.  Id.  On June 9, 2000, Plaintiff reported continued severe upper thoracic spine pain, which had not improved much at all over the past few months.  Id. at 313.  Plaintiff reported tenderness in the upper thoracic spine, but full range of motion on the cervical spine and shoulders with no pain.  Id.  Pain did not radiate around either rib.  Id.  An MRI had reported no evidence of stenosis or herniated disc, and x-rays of the thoracic spine were unremarkable.  Id.  Plaintiff reported continued back pain in the right midthoracic region on July 11, 2000.  Id. at 484.  Dr. Robinson diagnosed a chronic medial parascapular strain.  Id.  A note on patient's chart indicates that she phoned Dr. Robinson on August 8, 2000 to complain of increased back pain and gastrointenstinal difficulties.  Id. at 485.

Plaintiff treated with Dr. Mahender R. Goriganti, MD, beginning on August 21, 2000.  Id. at 486-8.  She complained of back pain as a result of a work injury, and reported she had been "miserable" until encountering improvement in the previous two or three weeks.  Id. at 486.  None of the treatment she underwent, including physical therapy and medication, had helped her.  Id.  She had difficulty sleeping, though the situation had improved within the past two weeks.  Id.  Dr. Goriganti examined Plaintiff and concluded she had suffered a thoracic spine sprain.  Id. at 487.  He determined that she could return to work on a light-duty basis.  Id.  Dr. Goriganti also determined that, since Plaintiff was six weeks pregnant, she could not be placed on a pain-management

5

program.  Id. at 488.

The same conditions prevailed when Dr. Goriganti saw Plaintiff on September 19, 2000.  Id. at 489.  On October 12, 2000, however, Plaintiff reported "progressively increasing pain" to her upper back and mid thoracic area posteriorly.  Id. at 490.  Dr. Goriganti determined to treat Plaintiff "conservatively" because of her pregnancy, but permitted a hot pack massage without ultrasound or electronic stimulation.  Id.  On November 15, 2000, Dr. Goriganti diagnosed Plaintiff with chronic myofascial pain syndrome after she returned to him with continued pain in her neck, interscapular area and low back.  Id. at 491.  Physical therapy was not helping Plaintiff.  Id.  Dr. Goriganti also noted that Plaintiff had some "emotional" issues, and that she "does have some component of symptom magnification."  Id.  On March 26, 2001, Plaintiff complained of pain in her back and mid thoracic region, but said the pain had decreased from previously.  Id. at 495.  Since Plaintiff was pregnant, Dr. Goriganti determined that a better evaluation could be made after she delivered her child.  Id.  Dr. Goriganti repeated his diagnosis of myofascial pain syndrome on May 25, 2001, when Plaintiff returned complaining of continued back pain.  Id. at 498.

Plaintiff returned to Dr. Robinson on December 19, 2000.  T at 493.  Plaintiff reported feeling better, with less upper back pain.  Id.  Still, she remained tender in the right upper thoracic region.  Id.  Dr. Robinson, like Dr. Goriganti, diagnosed Plaintiff with myofascial pain syndrome. Id.  On February 6, 2001, Plaintiff's upper thoracic pain had become "quite bothersome at times[.]" Id. at 494.  Robinson diagnosed her with a chronic scapular strain and myofascial pain syndrome. Id.  When Plaintiff returned on March 27, 2001, she was still bothered by medial and parascapular pain, at times on the left and at times on the right, and was tender along the medial borders of both scapulae.  Id. at 496.  Any surgical treatment would have to wait until after the birth of Plaintiff's

6

child.  Id.  Plaintiff's complaints continued on May 25, 2001, after she had her baby.  Id. at 497.

Given the severity and duration of Plaintiff's symptoms, Dr. Robinson could not rule out cervical

disc disease as a possible source of Plaintiff's medial parascapular pain.  Id.  On August 24, 2001,

Plaintiff reported that she continued to have "good days and bad days with her interscapular pain."

Id. at 499.  She presented similar complaints on September 18, 2001.  Id. at 500.  Plaintiff added

increased sensation in the dorsal radial forearm to her list of symptoms when she saw Dr. Robinson

on October 2, 2001.  Id. at 501.  The pain had extended at times into her right hand by October 30,

2001.  Id. at 503.  When Plaintiff saw Dr. Robinson on December 4, 2001, his examination showed

decreased sensation of the left C5 and C6 dermatones.  Id. at 504.  Electrodiagnostic studies

suggested C5 radiculopathy, and an MRI scan had shown a small right central disc osteophyte

compleex and broad based disc bulge at C5-6.  Id.  Dr. Robinson suggested treatment at the New

York Pain Clinic for nerve root block procedures.  Id.

Plaintiff's neck, shoulder and bilateral arm pain, right more than left, persisted on February

2, 2002.  Id. at 505.  Dr. Robinson noted that diagnostic examinations were suggested of right C5-6

pathology.  Id.  Neck pain and right arm pain, as well as right arm weakness and upper thoracic pain,

continued on April 9, 2002.  Id. at 506.  Dr. Robinson diagnosed chronic cervical radiculopathy

secondary to C5-6 herniated disc.  Id.  On May 28, 2002, Plaintiff reported to Dr. Robinson that she

continued to suffer right-sided neck, shoulder and arm pain that she found disabling.  Id. at 312.

Plaintiff's pregnancy prevented her from taking any medications or undergoing any invasive

treatment.  Id.  Plaintiff continued to complain of these problems on July 23, 2002, but also found

increased pain in her wrist.  Id. at 508.  Dr. Robinson diagnosed chronic cervical radiculopathy,

secondary to C5-6 herniated disc and progressive carpal tunnel syndrome on the right side.  Id.  On

7

September 20, 2002, Plaintiff reported that her pain was increasing in her neck and shoulder, and that she had continued right-arm pain and pain over the scapular area. Id. at 311. Plaintiff had difficulty sleeping. Id. She was seven months pregnant. Id. Dr. Robinson diagnosed chronic cervical radiculopathy secondary to C5-6 isues. Id. The same pain continued on November 29, 2002. Id.

Plaintiff treated with Dr. Robert L. Tiso at the New York Pain Center on December 4, 2002. Id. at 742-743. Plaintiff complained of an intermittent burning, sharp pain. Id. at 742. She rated her pain at between 5 and 9 on a 10 point scale, depending on the day. Id. Her pain was unpredictable, and got worse with both rest and movement. Id. When pain got worse, she needed to rest for several minutes for the pain to resolve. Id. The pain often kept her from sleeping. Id. Physical therapy did not help the pain, but made it worse. Id. After examination, Dr. Tiso diagnosed Plaintiff with a cervical herniated nucleus pulposus. Id. at 743. Dr. Tiso prescribed nerve blocks and a TENS unit to help Plaintiff deal with her pain. Id.

Right arm pain and posterior neck and upper back pain continued, as did Dr. Robinson's diagnosis of chronic cervical radiculopathy, C5-6 herniated disc, on January 10, 2003. Id. He also found that Plaintiff continued to be totally disabled from work. Id. On February 21, 2003, Dr. Robinson reported that Plaintiff's back pain continued, and that her two nerve blocks had not provided much relief. Id. at 516. Robinson diagnosed Plaintiff with cervical radiculitis, neck pain, herniated disc cervical–no myleopathy, and a herniated disc at C5-6. Id. at 517. Nothing had changed in Plaintiff's symptoms on April 16, 2003. Id. at 518-519. Dr. Robinson's diagnosis included cervical radiculitis, neck pain, herniated disc thoracic–no myelopahty, and a T5-6 herniated disc. Id. at 519. Similar complaints and diagnoses, including a finding that Plaintiff was

temporarily totally disabled, continued on June 20, August 26, October 20, and December 18, 2003. Id. at 520-531.

Plaintiff's treatment with Dr. Robinson continued into 2004. When she saw Dr. Robinson on February 23, 2004, Plaintiff reported continuing pain in her neck and right shoulder. Id. at 752. Her nerve blocks provided about a day of improvement, but the neck pain and right-sided shoulder and arm pain continued at the usual level. Id. at 753. The pain also radiated down the dorsal radial forearm and dorsum of the hand on the right. Id. Dr. Robinson's diagnosis was herniated disc cervical–no myelopathy, and he found Plaintiff temporarily totally disabled. Id. at 754. Plaintiff reported continued pain in the cervical spine and right shoulder and arm on April 6, 2004. Id. at 770-771. Dr. Robinson diagnosed her with a herniated disc cervical–no myelopathy, finding her temporarily totally disabled. Id. at 771. Nerve blocks reportedly did more to relieve Plaintiff's pain on her next visit to Dr. Robinson, on May 24, 2004. Id. at 755-757. She still used the TENS unit, and still suffered from discomfort in her right shoulder and arm, as well as her right wrist. Id. at 755. Dr. Robinson's diagnosis and restrictions were the same. Id. at 756. Similar complaints and diagnoses continued on July 13, September 7, and November 1, 2004. Id. at 758-766.

Plaintiff continued to complain of the same symptoms of neck pain and upper back pain and Dr. Robinson offered the diagnosis of a herniated cervical disk with no myelopathy on January 3, 2005. Id. at 322. She also complained of chest pain. Id. He continued to find that she was totally disabled from working. Id. at 323. When she saw Dr. Robinson on March 8, 2005, her condition was unchanged, complaining of pain in the neck and bilateral shoulders, as well as occasional numbness and tingling in the arms. Id. at 320. Dr. Robinson diagnosed her with cervical radiculitis, herniated disk cervical-no myleopathy, and neck pain. Id. Plaintiff offered similar

9

complaints and Dr. Robinson a similar diagnosis on April 19, 2005.  Id. at 773-775.

Various physicians performed independent medical examinations on the Plaintiff during the relevant period.  Plaintiff was evaluated by Philip T. Dontino, DC, on April 25, 2000.  Id. at 314-318.  Dr. Dontino related that Plaintiff had undergone various treatments since her injury.  Id. at 314-15.  Ice and heat, osteopathic manipulative treatment, and chiropractic adjustment had brought her no relief.  Id.  Plaintiff complained of constant right-sided thoracic pain extending to the lower part of her thoracic spine.  Id. at 315.  She found that bending forward, elevating her legs, and pushing and pulling caused her pain.  Id.  The pain was an average of 8 on a ten-point scale, but did not radiate into the extremities or around her torso.  Id.  After an examination, Dr. Dontino diagnosed Plaintiff will a cervical and thoracic strain and myofascial pain of the cervical/thoracic musculature (right).  Id. at 317.  Dr. Dontino found that Plaintiff's symptoms prevented her from returning to work in her previous position.  Id.

Dr. Edward D. Sugarman performed an independent medical evaluation of Plaintiff on June 13, 2001.  Id. at 307-308.  He reported that Plaintiff's pain began as she was handling packages at work.  Id. at 307.  After working out a package that had jammed, Plaintiff began to have pain in the right scapular area towards the middle of her back.  Id.  Plaintiff had discomfort in that area, but no arm pain.  Id.  Most of Plaintiff's pain came in the upper back area; this pain was persistent and severe.  Id.  She also reported periodic neck pain.  Id.  Dr. Sugarman's examination revealed that Plaintiff's cervical spine had a full range of motion, with a small amount of discomfort at the base of the neck on the right.  Id.  He found no significant arm pain, though she had scapular pain on the right when she pushed and pulled with her arms in the flexed position.  Id.  She also had some tenderness upon palpation of the T1-T4 area of her back.  Id.  Dr. Sugarman diagnosed a thoracic

strain.  Id.  Dr. Sugarman opined that Plaintiff had a "very mild degree of disability," and could

return to work in a sedentary capacity.  Id.

Dr. Daniel Carr, M.D., a board-certified orthopedic surgeon, performed an independent

medical evaluation of Plaintiff on October 29, 2001.  Id. at 304-306.  Plaintiff reported to Dr. Carr

that she had injured herself while working at UPS.  Id. at 304.  She suffered an "acute pain" while

picking up a package.  Id.  Physical therapy and chiropractic treatment offered her no relief, and

Plaintiff was forced to stop working in January 2000.  Id.  Plaintiff complained of upper back pain

between her shoulder blades and in the base of her neck immediately after her workplace incident.

Id.  The neck pain was mild, but would become worse when she leaned forward for a prolonged

period of time.  Id.  The Plaintiff also experienced constant dull, throbbing pain in her upper back.

Id.  After she underwent a nerve conduction test, Plaintiff experienced right-hand and wrist pain,

numbness, and tingling, particularly in the thumb and radial-sided digits.  Id.  Plaintiff did not have

any radicular symptoms in her neck and down her arm.  Id.  She treated her injuries with ibuprofen.

Id.  Examination revealed tenderness in Plaintiff's rhomboid muscles bilaterally, with no palpable

spasm.  Id. at 305.  Plaintiff also suffered from tenderness in her lower trapezius muscles.  Id.  Dr.

Carr found no tenderness in the cervical spine itself, however.  Id.  Plaintiff's range of motion in her

shoulder was full and pain-free.  Id.  Range of motion in the cervical spine was similarly full and

pain-free.  Id.  Dr. Carr diagnosed Plaintiff with upper thoracic back pain of non-specific origin,

myofascial pain.  Id.  Given the nature of her pain, Dr. Carr found that additional orthopedic

treatment would provide no relief.  Id. at 306.  Dr. Carr recommended that Plaintiff could return to

work without restrictions.  Id.

Dr. Carr performed another independent medical examination on January 20, 2003.  Id. at

301-303.  Plaintiff continued to complain of constant back pain, whether using her back or not.  Id. at 301.  The pain continued even when Plaintiff was sleeping or lying down, but varied in intensity and moved around from her mid back to her neck and from one side of her back to the other.  Id. at 301.  The back pain got worse with prolonged sitting, standing, leaning forward and back or turning sideways.  Id. at 302.  Plaintiff's neck pain came and went.  Id. at 301.  The pain was sharp sometimes, dull sometimes, and sometimes non-existent.  Id. at 302.   The pain was sometimes confined to the neck and sometimes radiated into her shoulders.  Id.  The neck pain sometimes radiated up and down the spine.  Id.  Plaintiff had begun a course of epidural injections, and these injections had not provided her with relief and may have made things worse.  Id. at 301.  Plaintiff had also recently developed pain in her right wrist and right elbow.  Id. at 302.  She used a TENS unit for her pain, underwent nerve blocks, took ibuprofen, and limited activity to deal with her pain.  Id. at 302.  Dr. Carr diagnosed Plaintiff with non-specific neck and upper thoracic pain consistent with myofascial pain, as well as degenerative disc disease at C4-5 and C5-6 levels.  Id. at 303.  He noted, however, that Plaintiff was able to care for three children younger than four years old without restriction.  Id.  In evaluating Plaintiff's workers' compensation claim, Dr. Carr concluded that including Plaintiff's degenerative disc disease left her with at most "a mild, partial disability."  Id.

Dr.  Carr performed another independent medical examination on October 8, 2003.  Id. at 297-300.  Plaintiff reported to Dr. Carr the nerve blocks she had recently received had initially made her condition worse.  Id. at 297.  For a brief period of time after that, the injections had improved her condition.  Id.  In the end, however, she had returned to the same level as before the blocks.  Id.  The blocks thus provided no lasting benefit.  Id.  Plaintiff also complained of continued pain in her right wrist.  Id.  Her symptoms were unchanged since her last examination by Dr. Carr, though she

complained of more right wrist pain than she had suffered previously. Id. Her right elbow pain had disappeared, but the pain to the dorsal, volar, ulnar and radial aspects of her wrist continued. Id. at 298. Plaintiff also complained of weakness in her right hand. Id. Plaintiff's symptoms altered from day to day: at times her neck pain was worse on the right side and sometimes it was worse on the left; the neck pain was sometimes worse when she turned her head, sometimes worse when she tilted her head forward and back; the pain was worse at times in the thoracic spine and at others times in the cervical spine. Id. There was no particular pattern. Id. Dr. Carr's examination revealed that Plaintiff's cervical spine rotation was "mildly guarded" when Plaintiff twisted her torso, but was otherwise full. Id. There was no palpable spasm at trigger points. Id. Plaintiff had a full range of motion in all of her joints in the upper extremities. Id. She suffered from tenderness in the right trapezius and both shoulder girdles diffusively. Id. Dr. Carr diagnosed Plaintiff with chronic, non-specific pain and right hand symptoms. Id. at 299. Dr. Carr also found degenerative disc disease at the C4-5 and C5-6 levels, but no nerve compression. Id. He found no evidence of carpal tunnel syndrome and no basis to recommend surgery for her disc herniations. Id.

Plaintiff began a series of cervical interlaminar cotricosteroid injections with fluroscopic guidance at St. Joseph's Hospital on January 9, 2003. Id. at 286. Plaintiff's preoperative and postoperative diagnosis was the same: cervical/neck pain; cervical herniated nucleus pulposus without myelopathy. Id. During the relevant period she repeated this procedure on January 9, 2003, February 6, 2003, February 17, 2004, March 16, 2004, and April 16, 2004. Id. at 282-286, 744.

On October 15, 2004, Plaintiff received treatment at Crouse Hospital in Syracuse, New York for chest pain. Id. at 326. She reported that the pain became worse if she changed positions or breathed, but that exertion did not cause additional pain. Id. Imaging revealed no significant soft

tissue or bony abnormalities, and normal cardiac, hilar and mediastinal contours. Id. at 327. The lungs and pleural spaces were likewise normal, as were diaphragm contours and position. Id. A lung ventilation and perfusion study showed a low probability of pulmonary embolus. Id. at 328.

Dr. Robinson submitted a medical source statement on September 21, 2010. Id. at 843-847. Dr. Robinson concluded that Plaintiff was not capable of sedentary exertion and would be required to follow multiple nonexertional limitations. Id. at 845-846. Plaintiff, he reported, could never move her neck up, down, left, right or in a static position. Id. at 847. Plaintiff's daily headaches, Dr. Robinson reported, would impair her concentration, limit her sleep, cause exhaustion, mood changes, mental confusion, and a poor appetite. Id. at 844-845. She would miss more than four days of work per month because of her impairments and their treatment. Id. at 847. These symptoms began in 2000. Id.

**b. Hearing Testimony**

Plaintiff testified at a hearing before Judge Peffley on January 20, 2011. Id. at 27. Plaintiff testified that since the onset of her injury in 1999, she had suffered from pain in her "neck, my upper thoracic" area. Id. at 41. The pain was "sharp," "dull," "achy," and "burning." Id. She experienced such pain "on a daily basis." Id. The pain was "constant." Id. at 54. Many days she could not get out of bed. Id. at 41. Turning her neck was often difficult. Id. She treated her condition with ice packs, heat, a TENS unit, and Lidoderm patches. Id. Plaintiff suffered a back injury in 2000/2001, which led to "excruciating pain" and "lingered for months on end." Id. at 42. Plaintiff's neck pain radiated "to the thoracic, to the right shoulder, down my arm; wrist very weak; constantly dropping things." Id. She suffered from numbness in both hands, more predominant in the right hand. Id. at 43. The pain that Plaintiff suffered between 2000 and 2005 caused her to suffer fatigue: "I didn't

14

sleep nights. I was fatigued during the day." Id. at 45. She could not drive and could not sleep, and found even getting off the couch to climb the stairs and use the bathroom difficult. Id. at 42. The pain radiated down the front of her leg and prevented her from walking "a lot of times." Id. at 47. The leg pain was mostly on the right side. Id. at 48. Plaintiff also testified that she suffered frequent "excruciating" headaches. Id. at 46. Between 2000 and 2005, Plaintiff suffered for a majority of the time from "deep," "throbbing" and "burning" pain at a level of 7-8 out of 10. Id. at 47. Plaintiff also suffered chest pain during that period. Id. at 50-51. She attributed this pain to her neck pain and found it to occur on a daily basis. Id. at 51. She also experienced shortness of breath. Id. at 52.

Plaintiff testified that from 2000-2005 she had been able to drive a car, but not for a long distance; only a few miles near her home. Id. at 48. She was able to sit, but only for 20 minutes at a time. Id. at 50. The pain would cause her to have to "reposition and lie." Id. Plaintiff is right-handed. Id. at 55. The pain in her arms and numbness in her hands prevents her from opening jars, and causes her frequently to drop pieces of paper or silverware. Id. at 56. She has difficulty grasping even light-weight objects. Id. at 56. She testified as well that she could not currently work at a computer for fifteen or twenty minutes at a time, and that she needed frequently to lay down during the day. Id. at 58. Such fatigue existed even in the 2000-2005 time period. Id. at 59. During that time she found that she could not do household chores as she had previously. Id. She relied on her family for things like laundry. Id. Her injuries and the limitations they caused meant that she saw less of her family than she formerly had and did not engage in the social activities she had with them previously. Id. at 62. The pain also affected her ability to concentrate on tasks such as writing bills. Id. She has to read things several times before she can understand them. Id. at 63.

15

The medication she took for her condition increased her mental stupor, making her feel "like a zombie." Id.

A vocational expert, Dr. Dothel Edwards, also testified at the hearing. Id. at 70. He testified that he had examined the Plaintiff's record and vocational background before testifying. Id. at 72. He found that her vocational background consisted of home attendant, and that her last relevant work was as a pre-loader, which could be classified as a store laborer. Id. The ALJ posed a hypothetical to the vocational expert:

> Let's do light work, except the person is further limited in that he or she can–should work in a job where the individual is allowed to leave the workstation. This hypothetical person can frequently push or pull with their right upper extremity, can frequently have foot control operation with the right lower extremity, can have frequent neck rotation, flexion and extension; should occasionally climb ramps or stairs, never climb ropes or scaffolds; occasionally balance, stoop, kneel, crouch, bend and crawl; can frequently reach with the upper extremity; can only occasionally overhead reach bilaterally with the upper extremities; frequently handle objects–that is gross manipulation with the right upper extremity; frequently finger–that is fine manipulation–with the right upper extremity; avoid concentrated exposure to operation and control of moving machinery and unprotected heights; avoid concentrated exposure to irritants such as fumes odors, dust, gases, poorly ventilated areas; and finally limited to simple, routine, and repetitive tasks in a work environment free of ast-paced production requirements involving only simple work-related decisions with few if any workplace changes.

Id. at 73-74. The ALJ and the expert agreed that Plaintiff could not perform her past relevant work because of these conditions. Id. at 74. According to Dr. Edwards, however, other work meeting Plaintiff's limitations would be available. Id. Since Plaintiff had no limitations on the left upper extremity for frequent pushing and pulling, she could work as a garment bagger. Id. at 74. That position was unskilled, and offered approximately 700,000 positions within the national economy and 1,400 in New York State. Id. 74-75. She could also work as a sorter, which had a light exertional level. Id. at 75. This unskilled position had 467,000 jobs in the national economy and

2,000 in New York.  Id.   The light-exertional level position of garment sorter also applied, offering

280,000 jobs in the national economy and 300 in New York.  Id.

The ALJ then offered a second hypothetical, which maintained the same abilities as the first

hypothetical but offered further limitations:

> this person can occasionally push/pull with the right upper extremity, occasionally
> reach with their right extremity–these are the limitations–they can only occasionally
> handle with their right upper extremity, occasionally finger with their right upper
> extremity; occasional neck rotation, flexion and extension.  Otherwise the limitations
> remain the same.

Id. at 76.  Under this scenario, given the limits on "neck extension and rotation," none of the

previously listed jobs would be available.  Id.  Those jobs all require "at least frequent to constant

handling and fingering bilaterally."  Id.  No other jobs were available with this limitation either.  Id.

at 77.

On cross-examination, Dr. Edwards testified that if a worker suffered from pain that

interfered with concentration necessary to perform simple tasks "on a constant basis," that person

could not perform any of the tasks available on the first hypothetical.  Id. at 79.  If a person was

forced to be absent for three days per month, Dr. Edwards testified, that person would also not

qualify for any of the positions he identified.  Id. at 79-80.  No other jobs would be available either.

Id. at 80.   Likewise, if the worker had to walk away from the work station every 20 to 30 minutes

for five or ten minutes at a time, regardless of scheduled breaks, that person would not be able to

work at the jobs he had identified.  Id. at 81.  The same situation would apply for a worker who had

to take unscheduled breaks to lie down for twenty minutes at a time.  Id. at 82.

## III.     DISCUSSION

### A.  Legal Standard

17

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities." The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). There is a five-step analysis for evaluating disability claims:

> In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green–Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)(quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002))(internal citations omitted).

The Court's review of the Commissioner's determination is limited to two inquiries. *See* 42 U.S.C. § 405(g). First, the Court determines whether the Commissioner applied the correct legal standard.[3] *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998); *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990); *Shane v. Chater*, No. 96-CV-66, 1997 WL 426203, at *4 (N.D.N.Y July 16, 1997)(Pooler, J.)(citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)). Second, the Court must determine whether the Commissioner's findings are supported by substantial evidence in the administrative record.[4] *See Tejada*, 167 F.3d at 773;

---

[3]Plaintiff's pleadings could not be read to conclude that she argues that the ALJ applied the wrong legal standard, and the Court will therefore find that there is no dispute that the ALJ correctly concluded that the five-step sequential evaluation process was the proper method for determining whether Plaintiff was disabled under the Act.

[4]Plaintiff submitted additional evidence in the form of medical records not contained in the administrative record as an exhibit to her brief. As the Court's review is limited to whether substantial evidence existed in the administrative record, the Court will not address the additional evidence submitted to this Court by the Plaintiff. The

(continued...)

*Balsamo*, 142 F.3d at 79; *Cruz*, 912 F.2d at 11; *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982). A Commissioner's finding will be deemed conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *see also Perez*, 77 F.3d at 46; *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)("It is not the function of a reviewing court to determine *de novo* whether a Plaintiff is disabled. The [Commissioner's] findings of fact, if supported by substantial evidence, are binding.") (citations omitted). In the context of Social Security cases, substantial evidence consists of "more than a mere scintilla" and is measured by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 842 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)). Where the record supports disparate findings and provides adequate support for both the Plaintiff's and the Commissioner's positions, a reviewing court must accept the ALJ's factual determinations. *See Quinones v. Chater*, 117 F.3d 29, 36 (2d Cir. 1997)(citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)); *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). However, although the reviewing court must give deference to the Commissioner's decision, a reviewing court must bear in mind that the Act is ultimately "'a remedial statute which must be 'liberally applied;' its intent is inclusion rather than exclusion.'" *Vargas v. Sullivan*, 898 F.2d 293, 296 (2d Cir. 1990)(quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### B. Plaintiff's Arguments

Plaintiff proceeds without the assistance of an attorney in this action. Under those

---

[4](...continued)
ALJ did not have that evidence in making his decision.

19

circumstances, "the pleadings of a *pro se* plaintiff must be read liberally and should be interpreted to 'raise the strongest arguments that they suggest.'" *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). Plaintiff lists several alleged "errors" in the ALJ's decision. She contends that:

> 1. She disagrees with the ALJ's finding that her listed impairments are severe because those impairments "have been diagnosed by an acceptable medical source and cause more than a minimal effect on the claimant's ability to perform basic, work related activities", contending that "my thoracic and cervical pain has been excruciating and debilitating throughout the years. The intensity of the pain prohibited me from participat[ing] in various activities with my family. This started from onset of injury and has continued to present," making Plaintiff a candidate for surgery for which she is still seeking approval;
> 2. Plaintiff underwent wrist surgery in April 2013 to alleviate her wrist pain and carpal tunnel syndrome which has persisted since her initial injury;
> 3. Plaintiff suffered excruciating lubrosacral pain in 2001, preventing her from going up and down stairs, turning without great pain, or "doing any everyday activities" for several months in that year;
> 4. Headaches that were frequent, but have somewhat subsided between 2000-2012;
> 5. Chest pain and fatigue were frequent after her diagnosis with anxiety and depression in March 2005, and she received medical treatment for those injuries; and
> 6. Her orthopedic physician since 2000 has diagnosed spinal, wrist pain, headaches, chest pain, fatigue, anxiety/depression, and gastroesophageal reflux disease, as well as symptoms of tenderness, muscle spasm/weakness, chronic fatigue, impaired sleep, lack of coordination, reduced grip strength, abnormal posture and reduced range of motion.

Reading these arguments to raise the strongest claims they suggest, the Court concludes that Plaintiff argues that:

1. The ALJ's finding that the Plaintiff suffered from the severe impairments of: cervical herniated nucleus pulposes, mild carpal tunnel syndrome, chronic low back pain, headaches and gastroesophageal reflux disease was not supported by substantial evidence

2. The ALJ's finding that Plaintiff did not have an impairment or combination of impairments that met or medically equally one of the listed impairments in 20 CFR Part 404 Subpart P Appendix 1 (20 CFR 4040.1520(d), 404.1525 and 404.1526, was not supported by substantial

evidence;

3. The ALJ's finding of Plaintiff's residual functional capacity was not supported by substantial evidence; and

4. The ALJ's finding that significant jobs existed in the national economy that Plaintiff could perform was not supported by substantial evidence.

Defendant rejects these arguments and insists that the decision should be affirmed. The Court has organized the Plaintiff's arguments to address the five-step sequential evaluation process outlined in 20 C.F.R. § 404.1520(a), where such steps are relevant. The Court first finds that there is no dispute between the parties that claimant last met the insured status requirements of the Social Security Act on March 31, 2005. *See* T at 16. The Court also finds that the ALJ's conclusions at the first step of the process was supported by substantial evidence. The evidence in the record established that Plaintiff has not engaged in substantial gainful activity from the alleged onset date of December 24, 1999 until her last insured date, March 31, 2005. The Courts consideration of the evidence will be limited to that period. The Court will address each of the remaining issues *seriatim*.

### C.     Plaintiff's Impairments

The ALJ found that Plaintiff suffered from the severe impairments of cervical herniated nucleus pulposes, mild carpal tunnel syndrome, chronic low back pain, headaches and gastroesophageal reflux disease. T 16.

The Court finds that substantial evidence supports the ALJ's conclusions in this respect. The Court reiterates that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. Plaintiff's treating

physicians and the physicians who examined her in workers-compensation-related proceedings, as explained above, offered diagnoses of these conditions at various times. During the relevant period, for instance, Dr. Carr diagnosed Plaintiff with non-specific neck and upper thoracic pain consistent with myofascial pain, as well as degenerative disc disease at C4-5 and C5-6 levels. T at 303. Dr. Goriganti diagnosed Plaintiff with chronic myofascial pain syndrome after she returned to him with continued pain in her neck, interscapular area and low back in November 2000. Id. at 491. Dr. Robinson diagnosed a chronic medial parascapular strain as early as July 2000. Id. at 484. On November 15, 2000, Dr. Goriganti diagnosed Plaintiff with chronic myofascial pain syndrome after she returned to him with continued pain in her neck, interscapular area and low back. Id. at 491. Dr. Tiso also diagnosed Plaintiff with a cervical herniated nucleus pulposus. Id. at 743. On July 30, 2002, Dr. Robinson diagnosed chronic cervical radiculopathy, secondary to C5-6 herniated disc and progressive carpal tunnel syndrome on the right side. Id. The injuries accepted by the ALJ were also injuries about which Plaintiff complained during her own testimony. Plaintiff testified, for instance, that she suffered frequent "excruciating" headaches. Id. at 46. In terms of her back and neck pain, Plaintiff testified that between 2000 and 2005 she suffered for a majority of the time from "deep," "throbbing" and "burning" pain at a level of 7-8 out of 10. Id. at 47.

As explained above, where the record supports disparate findings and provides adequate support for both the Plaintiff's and the Commissioner's positions, a reviewing court must accept the ALJ's factual determinations. See Quinones, 117 F.3d at 36; Alston, 904 F.2d at 126. Moreover, in finding that Plaintiff suffered from headaches and gastroesophogeal reflux disease, the ALJ relied on Plaintiff's testimony as to her condition as much as he relied on any other medical evidence. As such, the ALJ did not ignore Plaintiff's credible complaints of pain, but instead weighed those

complaints against the other credible medical evidence in coming to a conclusion. This Court's task is not to re-weigh the medical evidence, but to determine if substantial evidence supports the ALJ's findings.

Because his conclusions were supported by substantial medical evidence in the record, the Court concludes that the ALJ's finding that the Plaintiff suffers from the severe impairments of: cervical herniated nucleus pulposus; mild carpal tunnel syndrome, chronic low back pain, headaches, and gastroesophageal reflux disease are supported by substantial evidence.

### D. Plaintiff's Impairments Did not Meet or Medically Equal one of the Listed Impairments

The ALJ thus properly found that Plaintiff had a severe impairment. The next step at issue in the process was to consider whether Plaintiff suffered from an impairment listed in Appendix 1 to Subpart P of Part 404 of the Social Security Regulations, or suffered from an impairment equal to one of the listed impairments. *See* 20 C.F.R. § 404.1520(d). If the ALJ had found that Plaintiff suffered from such an impairment, the ALJ would have found Plaintiff disabled without having to consider any of the other factors. Id.

The ALJ concluded that the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ found that Claimant's cervical disc disease did not meet listing 1.04 for disorders of the spine, because the medical evidence of record failed to demonstrate the presence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising test; spinal arachnoiditis or lumbar

spinal stenosis resulting in pseudoclaudication.  T at 17.

Section 1.04 of Appendix 1 describes the disorders of the spine which could lead to a finding

of disability.   A disorder of the spine "resulting in compromise of a nerve root (including the cauda

equina) or the spinal cord" results in disability if there additionally is:

>  A. Evidence of nerve root compression characterized by neuro-anatomic distribution of
> pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness
> or muscle weakness) accompanied by sensory reflex loss and, if there is involvement of the
> lower back, positive straight-leg raising test (sitting and supine); or
> B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy,
> or by appropriate medically acceptable imaging, manifested by severe burning or painful
> dysethesia, resulting in the need for changes in position or posture more than once every 2
> hours; or
> C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by finding on
> appropriate medically acceptable imaging, manifested by chronic non radicular pain and
> weakness, and resulting in inabiltiyto ambulate effectively[.]

Appendix 1 to Subpart P of Part 404 of Social Security Regulations, at § 1.04.

The Court concludes that substantial evidence supports the ALJ's finding that Plaintiff's

impairments do not meet one of the impairments listed in Appendix 1, or are an impairment equal to

one of the listed impairments.  The medical evidence related above provides support for the ALJ's

finding in this respect.  None of the medical evidence provide evidence for any conditions or

limitations described in the relevant sections, and the ALJ's conclusion must therefore be upheld in

this respect.

### E.  Residual Functional Capacity

Plaintiff's primary complaint appears to be that the ALJ incorrectly assessed her residual

functional capacity by failing to accept her own claims about her limitations.  Plaintiff's subjective

complaints at her hearing and in her filing indicate that she asserts she suffers from a constant

debilitating pain that makes working impossible for her, and she can point to some evidence in the

24

record, such as Dr. Robinson's medical source statement from 2010, that indicates that she suffers from severe impairments that prevent her from working. The statement of her treating physician, Dr. Robinson, places much more severe limitations on her activities than does the ALJ.

The Court will first address Dr. Robinson's statement. Dr. Robinson's statement invokes the "treating physician rule." [5] According to the treating physician's rule, the ALJ must give controlling weight to the treating physician's opinion when that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2); *see also Green-Younger v. Barnhart*, 335 F.3d 99, 105 (2d Cir. 2003); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). However, the opinion of the treating physician is not afforded controlling weight where the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) (report of a consultative physician may constitute substantial evidence to contradict the opinion of a treating physician); 20 C.F.R. § 404.1527(d)(2).

Even if a treating physician's opinion is deemed not to be deserving of controlling weight, an ALJ may nonetheless give it "extra weight" under certain circumstances. Under 20 C.F.R. § 404.1527(d)(1)-(6), the ALJ should consider the following factors when determining the proper weight to afford the treating physician's opinion if it is not entitled to controlling weight: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the

---

[5]"The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion." *de Roman v. Barnhart*, 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003).

treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of the treating physician, and (6) other factors. *See de Roman*, 2003 WL 21511160, at *9 (citing C.F.R. § 404.1527(d)(2)); *see also Shaw*, 221 F.3d at 134; *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).

The regulations specify that the Commissioner "will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion." *Id.; accord* 20 C.F.R. § 416.927(d)(2); *see also Schaal v. Apfel*, 134 F.3d 496, 503-04 (2d Cir.1998)(stating that the Commissioner must provide a claimant with "good reasons" for the lack of weight attributed to a treating physician's opinion). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is ground for remand." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (*citing Schaal*, 134 F.3d at 505).

The ALJ addressed Dr. Robinson's opinion. *See* T at 19-20. The ALJ gave only "some weight" to Dr. Robinson's opinion, finding that the opinion "is not entirely supported by his own treating records or the other medical evidence of record for the period prior to March 21, 2005." Id. at 20. The ALJ pointed out that Dr. Robinson's opinion that Plaintiff could "do significantly less than sedentary exertion since 2000" was not supported by the medical evidence. Id. To support this opinion, the ALJ noted that Dr. Robinson's own treatment notes "reflect that on multiple occasions [Plaintiff] may be able to engage in light work even if she could not return to her previous work." Id. In 2000, the ALJ noted, Dr. Robinson opined that Plaintiff could return to work after her pregnancy ended. Id. Physical examinations also revealed that Dr. Robinson's opinion that Plaintiff could never move her neck in certain positions or directions was not supported by his own treatment. Id. Because of these and other inconsistencies, the ALJ refused to give more than some

weight to the opinion.

The Court finds that the ALJ properly explained the limited weight afforded to Dr. Robinson's opinion. The ALJ stated reasons based on the evidence in the record and pointed to specific inconsistencies between Dr. Robinson's own treatment notes and the opinion he rendered ten years after making some of those notes. The ALJ therefore provided good reasons for the weight given the treating physician's opinion; after pointing to inconsistencies between Dr. Robinson's records, the other medical evidence, and the opinion, the ALJ concluded that Robinson's statements about Plaintiff's ability to work during the relevant period should not be accorded substantial weight. For the reasons the ALJ provided, the Court finds that substantial evidence existed in the record to support these conclusions.

Moreover, the Court notes that Dr. Robinson's opinion, provided in 2010, references Plaintiff's condition at that time and does not note whether the Plaintiff's condition in 2005 was substantially better or worse than in 2010. His opinion simply points out that the "earliest date that the description of symptoms and limitations in this questionnaire applies" was in 2000. The medical evidence recounted above indicates, however, that not even all of the limitations reported in Dr. Robinson's treatment notes were present in 2000. The notes suggest that Plaintiff's maladies increased over time. Thus, to find that the 2010 limitations, even if they were accurate, applied in 2005 would be inconsistent with the record. When an opinion is inconsistent with other substantial evidence, the Commissioner is not required to afford deference to that opinion, and may use discretion in weighing the medical evidence as a whole. *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (deference to treating source's opinion was not required where treating physician issued opinions that were not consistent with other substantial evidence in the record); *Veino v.*

27

*Barnhart*, 312 F.3d 578, 587-88 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.").

The Court also notes that Dr. Robinson's treatment notes frequently offer an opinion that Plaintiff was temporarily "totally disabled" from work. These opinions were rendered in the context of Plaintiff's receipt of workers' compensation funds, not offered as an opinion on Social Security disability. Courts are clear that "[w]hile the determination of another governmental agency that social security disability benefits claimant is disabled is not binding on the Secretary, it is entitled to some weight and should be considered." *Cutler v. Weinberger*, 516 F.2d 1282, 1286 (2d Cir. 1975); *see also Lohnas v. Astrue*, 510 Fed. Appx. 13, 14-15 (2d Cir. 2013) (when a decision is supported by substantial evidence, failure to fully consider opinion of another agency is not grounds for remand). Moreover, determining whether a person is disabled for workers' compensation purposes involves answering different questions than those involved in this case. *Compare* New York Workers' Compensation Law § 10, *et seq.,* and 20 C.F.R. § 404.1504. Just because a person might be eligible for workers' compensation does not mean that person is automatically eligible for Social Security Disability Benefits. Moreover, as explained above, other doctors who evaluated Plaintiff in the same workers' compensation context came to different conclusions about her disability. Dr. Robinson's opinion on that issue is not controlling on the issue here, and the ALJ properly made his decision based on the standards articulated in the Social Security Regulations.

Plaintiff's complaint could also be taken as a claim that the ALJ failed to credit her subjective claims of pain and limitations described above. An ALJ has discretion to evaluate the credibility of a claimant and to make an independent judgment based on medical findings regarding the true extent of the claimant's symptoms. *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984);

*Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983). It is the function of the Commissioner, not the reviewing court, to "resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Caroll v. Sec'y of Health and Human Serv.*, 705 F.2d 638, 642 (2d Cir. 1983); *see Gernavage v. Shalala*, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995)(An ALJ's determination with respect to the credibility of witnesses is given great deference because the ALJ heard the testimony and observed the demeanor of the witnesses). Further, Plaintiff must produce appropriate, probative evidence in support of any subjective statements of symptoms, 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4), and the ALJ's decision to discount Plaintiff's statements of symptoms must be accepted by a reviewing court unless it is clearly erroneous. *Centano v. Apfel*, 73 F. Supp. 2d 333, 338 (S.D.N.Y.1999). "An ALJ's evaluation of Plaintiff's credibility is entitled to great deference if it is supported by substantial evidence." *Nelson v. Astrue*, No. 5:09-CV-00909, 2010 WL 3522304, at *6 (N.D.N.Y. Aug. 12 2010).

When an individual has a medically determinable impairment that could reasonably be expected to produce the symptoms alleged, but the objective evidence does not substantiate the alleged intensity and persistence of the symptoms, the ALJ considers other factors in assessing the individual's subjective symptoms. These factors include: (1) Plaintiff's daily activities; (2) the nature, duration, frequency and intensity of his symptoms; (3) precipitating and aggravating factors; (4) the type of medication and other treatment or measures which Plaintiff uses to relieve pain and other symptoms; (5) treatment other than medication Plaintiff has received for relief of pain and other symptoms; (6) any other measures used by Plaintiff to relieve pain and other symptoms; and (7) other factors concerning Plaintiff's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Here, the ALJ applied these factors and found that the record did not support Plaintiff's claims that she had excruciating and debilitating pain daily in her neck and back and symptoms of numbness and pain in her right shoulder since her alleged onset date. T at 19. The ALJ noted that Plaintiff cared for three minor children, born in 1999, 2001 and 2002, during the relevant period, and that the obstetrics and gynecology records from that period do not reflect substantial limitations on activities. Id. The medical evidence in the record supports the ALJ's findings; these records note no significant limitations or pain in the back or neck during pregnancies and during other examinations. *See* T at 324-47. This Court likewise agrees that the medical evidence in the record does not support any claim for severe and debilitating headaches before March 31, 2005. *See* T at 19. The only evidence in the record related to breathing difficulties or chest problems before that date comes from evidence related to gastroesophogeal difficulties. Id. In addition, any complaints that Plaintiff's wrist and arm injuries were more severe than the mild carpal tunnel syndrome found by the ALJ is belied by the fact that nowhere in the medical record from the relevant period does Plaintiff complain that she frequently drops items, or that pain in the wrist is debilitating. Moreover, the medical records contain frequent reports of wrist and arm pain, but only one brief mention of "progressive" carpal tunnel syndrome by Dr. Robinson, with no mention that the condition was severe or debilitating. Thus, a finding of mild carpal tunnel syndrome is supported by substantial evidence.

The ALJ had substantial evidence to support his finding that Plaintiff's description of the limits on her daily activities was not supported by the medical evidence in the record. *See* T at 19. Despite any implication to the contrary, the Court finds that the ALJ applied the correct legal standard and, in doing so, interpreted the medical evidence as well as Plaintiff's testimony correctly.

The ALJ's assessment of the credibility of Plaintiff's asserted limitations is not clearly erroneous. Affording the ALJ the deference that is due, the Court finds no reason to remand for purposes of re-addressing Plaintiff's credibility or a re-assessment of her residual functional capacity.

### F.      Presence of Jobs

The final issue raised by implication in Plaintiff's filing concerns the final step in the disability process.  At Step 5, the burden shifts to the Commissioner "to prove the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical and mental capabilities, but also his age, education, and his experience and training." *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).   In this case, the ALJ relied on the testimony of a vocational expert to determine whether substantial work existed which the Plaintiff could perform.  Courts have found that such testimony can "[discharge] the Secretary's burden as to the availability of work for which a partially disabled claimant remains vocationally suited." *Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir. 1981).   Indeed, failure to develop the testimony of such an expert when there is a question about whether a Plaintiff's "nonexertional limitations preclude him from performing other work in the national economy" can be grounds for reversal.  *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004).

The ALJ's opinion acknowledges the limitations on Plaintiff's residual functional capacity, noting that her ability to perform a full range of light work under Medical-Vocational Rule 202.21 was limited by certain medical limitations.  Utilizing the testimony of a vocational expert, however, the ALJ concluded that jobs existed in significant numbers in the national economy for a person with Plaintiff's limitations.  As explained above, Dr. Edwards' testimony examined Plaintiff's past relevant work and determined whether a person with limitations established by the ALJ and based

on the record could perform any substantial gainful work. T at 72. The ALJ posed a hypothetical based on the RFC he had established for Plaintiff and, after Dr. Edwards concluded that these limitations prevented Plaintiff from performing that work, he found that other work available meeting Plaintiff's limitations. Id. at 73-74. Since Plaintiff had no limitations on the left upper extremity for frequent pushing and pulling, she could work as a garment bagger. Id. at 74. That position was unskilled, and offered approximately 700,000 positions within the national economy and 1,400 in the state of New York. Id. at 74-75. She could also work as a sorter, which had a light exertional level. Id. at 75. This unskilled position had 467,000 jobs in the national economy and 2,000 in New York. Id. The light-exertional-level position of garment sorter also applied, offering 280,000 jobs in the national economy and 300 in New York. Id. The ALJ also offered a second hypothetical which placed more limitations on the Plaintiff, and Dr. Edwards offered an analysis based on that hypothetical. Id. at 76. That scenario had limits on "neck extension and rotation," and none of the previously listed jobs would be available. Id. Those jobs all require "at least frequent to constant handling and fingering bilaterally." Id.. No other jobs were available with this limitation either. Id. at 77.

The Court finds that this testimony provides substantial evidence for the ALJ's conclusion that Plaintiff was not disabled under step five of the process. The ALJ solicited evidence from an expert on the number of jobs available that could fit the specific limitations that the ALJ had established for the Plaintiff using the relevant medical evidence. The expert's conclusions were not unreasonable or unrelated to the evidence or the hypotheticals posed by the ALJ. Such testimony and the evidence that supported that testimony provide substantial evidence for the ALJ's conclusion that the Plaintiff does not qualify as disabled under the Act.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiff's motion on the pleadings is **DENIED**,

Defendant's motion on the pleadings is **GRANTED**, and the Court **AFFIRMS** the final decision of

the Commissioner.

**IT IS SO ORDERED.**

Dated: March 27, 2014

Thomas J. McAvoy
Senior, U.S. District Judge